# EXHIBIT C

**TO**

**PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

| Form 886-A (REV JANUARY 1994) | EXPLANATIONS OF ITEMS | | SCHEDULE NO. OR EXHIBIT Form 4549 |
|---|---|---|---|
| NAME OF TAXPAYER Robert B. and Michelle S. Diener | | TAX IDENTIFICATION NUMBER 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 | YEAR/PERIOD ENDED December 31, 2000 |

**Substantial Understatement Penalty** **$2,291,211**

## Issue

Whether the accuracy related penalty provided by § 6662 applies to the deficiency resulting from the increase in income attributable to the receipt of HRN stock.

## Facts

An adjustment is proposed to increase the taxpayer's capital gain based on additional fair market value determined on HRN stock. An understatement of income tax exists for a taxable year if the amount of understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000 ($10,000 in the case of corporations other than S corporations or personal holding companies). I.R.C. §6662(d)(1). As proposed, the adjustment results in an understatement of income tax greater than 10% of the tax required to be shown on the tax return.

Robert Diener is the co-founder and 50% shareholder of TMF Incorporation (TMF) and HRN Marketing Corporation (Marketing). TMF and Marketing sold their assets to HRN Corporation in 1999. Mr. Diener assigned the rights to his 50% of the sales proceeds to a liquidating trust (Trust) in which he controlled 50%. During the 2000 tax year Mr. Diener, through the liquidating trust, received cash and 4,999,950 shares of restricted stock of HRN Corporation in connection with the 1999 asset sale.

The taxpayer sought and obtained two separate appraisals to determine the fair market value of the restricted stock on February 24, 2000, the date of receipt. The two valuations differed however; both valuations determined a FMV substantially less than the $16/share figure at which the stock went public on February 25, 2000. HRN valued the stock at $16/share for purposes of establishing the total cost of the asset acquisition.

Mr. Diener and HRN were not able to reach an agreement as to the FMV of the restricted stock. As a result, a precise total sales price was never established between the parties to the transaction. No Form 8594, Asset Acquisition Statement Under Section 1060 was attached to the 1999 or 2000 tax returns of TMF, Marketing or Trust to indicate the allocation of or the total consideration received for the sale of assets.

Mr. Diener reported the gain on the receipt of HRN stock using the higher of his two valuations which indicated a total FMV of 45,437,824 or an average value of $4.5438/share[1]. Mr. Diener reported his 50% portion of the proceeds, or $22,718,912.

The inconsistency in the fair market value reported by Mr. Diener and HRN has resulted in an understatement of taxable income of $57,280,288 [($16.00 - $4.5438) X 4,999,950] between the tax returns

* * * *

[1] Rounded.

181

| Form 886-A (REV JANUARY 1994) | EXPLANATIONS OF ITEMS | | SCHEDULE NO. OR EXHIBIT Form 4549 |
|---|---|---|---|
| NAME OF TAXPAYER Robert B. and Michelle S. Diener | | TAX IDENTIFICATION NUMBER 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 | YEAR/PERIOD ENDED December 31, 2000 |

of Robert and Michelle Diener and HRN. As proposed, the adjustment results in a substantial understatement of income tax.

## Law

I.R.C. §§ 6662(a) and 6662(d) impose an accuracy-related penalty in an amount equal to 20 percent of the portion of an underpayment attributable to any substantial understatement of income tax. See Treas. Reg. §§ 1.6662-1 through 1.6662-4.

An understatement is substantial if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. See §6662(d)(1)(A).

The term "understatement" generally means the excess of the amount of tax required to be shown on the return over the amount of tax shown on the return. §6662(d)(2)(A).

In calculating the understatement, the taxpayer is permitted a reduction for that portion attributable to "the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment," 26 U.S.C. § 6662(d)(2)(B)(i), or "any item if the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return and there is a reasonable basis for the tax treatment of such item by the taxpayer." 26 U.S.C. § 6662(d)(2)(B)(ii)(I & II).

Section 6664(c) provides a "reasonable cause exception to penalties imposed under §6662. Under § 6664(c), "no penalty shall be imposed under this part with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." I.R.C. § 6664(c)(1).

## Government's Position:

This issue results from the inability of the parties to the transaction to reach an agreement as to the proper FMV of restricted stock issued in connection with a taxable asset acquisition.

It is the Service's position that, in a transaction between two independent parties to an arm's-length transaction, a valuation issue of this nature should not be required to be addressed during the course of an examination. The government should not be burdened with the task of resolving a dispute between independent parties to a transaction of this nature. An agreement as to the FMV of the stock should have established between the parties prior to tax returns being filed. As the result of the taxpayer's failure to do so, a substantial understatement of income tax has been determined.

Section 6662(d)(2)(B) provides that the amount of the understatement is reduced by any portion of the understatement attributable to an item if (1) the tax treatment of any item by the taxpayer is or was supported by substantial authority for such treatment, or (2) the facts relevant to the tax treatment of the item were adequately disclosed in the return or in a statement attached to the return and there is a reasonable basis for the tax treatment of such item by the taxpayer. The taxpayers have not shown that they had substantial authority for the treatment of the gain nor did they disclose in the return the relevant facts related to the gain.

182

The accuracy-related penalty does not apply to any portion of an underpayment with respect to which it is shown that there was reasonable cause and that the Taxpayer acted in good faith. I.R.C. § 6664(c)(1). The determination of whether a Taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Treas. Reg. § 1.6664-4(b)(1).

The taxpayers have not shown that there was reasonable cause nor have they shown that they acted in good faith with regard to the gain reported on the receipt of stock. The Dieners sought two appraisals to determine the FMV of the stock however, the FMV determined in both appraisals differed from the FMV determined by HRN. The taxpayer filed their tax return using the higher of their two valuations but knowing that the valuation issue had not been resolved between the two parties.

Section 1060(b) requires the seller and the purchaser to report certain information in connection with an applicable asset acquisition. Form 8594, Asset Acquisition Statement is the information return to be used in reporting these transactions. Total sales price is required on Line 3 of the form and serves as the starting point in allocating the sales price among the various classes of assets. The information reporting requirements are intended to encourage compliance with the substantive rules of section 1060 and to assist the Internal Revenue Service in identifying returns which are likely to involve an attempt to amortize goodwill or going concern value.[2] Verification of consistency in the value of amortizable goodwill or going concern between the buyer and seller can be accomplished by comparing Forms 8594 prepared by each party to the transaction. Both parties to the transaction are identified on the form.

The primary purpose of Form 8594 is not to disclose discrepancies in the total sales price of a transaction although this can be determined based on figures provided on line 3 of the form. It is a given that this figure should be consistent between two independent parties to a transaction. However, since Mr. Diener did not cause either of his corporations nor his liquidating trust to file Form 8594, the inconsistency in reporting was discovered by chance, only as the result of an examination of the tax return.

## Conclusion:

The accuracy related penalty under section 6662(a) and 6662(c) should be applied if a substantial understatement is determined. The taxpayer has not shown they had substantial authority for their computation of the gain nor did they disclose the inconsistency in determining the gain on their tax return. Finally, since the taxpayer has not shown they acted with reasonable cause and good faith in reporting the transaction, the penalty should be assessed to the extent a substantial understatement is determined.

* * * *

[2] T.D. 8215, 1988-2 C.B. 304 (1988).

183

| Form 886-A (REV JANUARY 1994) | EXPLANATIONS OF ITEMS | | SCHEDULE NO. OR EXHIBIT Form 4549 |
|---|---|---|---|
| NAME OF TAXPAYER | | TAX IDENTIFICATION NUMBER | YEAR/PERIOD ENDED |
| Robert B. and Michelle S. Diener | | 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 | December 31, 2000 |

| | 12/31/2000 |
|---|---|
| **Gain per return on the receipt of HRN stock** | **22,718,912** |
| **Gain per examination on the receipt of HRN stock** | **79,999,200** |
| **Examination adjustment to income** | **57,280,288** |

## Issue

Whether the taxpayer's taxable income from capital gains should be increased for the additional value determined of stock received in exchange for the sale of business assets.

## Facts

Robert Diener and David Litman are co-founders of TMF Incorporation (TMF) and HRN Marketing Corporation (Marketing).[1] TMF operated Hotel Reservations Network; an internet business through which on-line discount hotel reservations could be booked. Marketing provided marketing, advertising, promotional activities and public relations for TMF on a contract basis. Robert Diener, as 50% shareholder of each Subchapter S corporation, reported his portion of the business results of TMF and Marketing on his individual income tax return.

In 1999 the assets and liabilities of TMF and Marketing were purchased by HRN, Inc. (HRN), a wholly-owned subsidiary of Interactive Corporation f/k/a "USA Interactive" and "USA Networks, Incorporated". In return for the sale of their assets and liabilities TMF and Marketing received cash and the right to contingent cash payments over a three year period following the acquisition. The amount of these contingent payments depended on the performance of HRN during the twelve month periods ending March 31, 2000, 2001 and 2002, respectively. Additionally, TMF and Marketing were entitled to receive stock equal to approximately 10% of HRN's equity in the event HRN initiated an initial public offering (IPO).

To facilitate the liquidation of the remaining assets of TMF and Marketing, in May of 1999 Messrs. Diener and Litman formed TMF Liquidating Trust (Trust), a grantor trust, solely for the purpose of liquidating certain property for the benefit of its beneficiaries. Property to be liquidated included the contingent payments due from HRN and/or the right to any HRN stock in the event of HRN's IPO. Messrs Diener and Litman are co-trustees and, together with certain trusts for the benefit of their children, are beneficiaries of the Trust.[2]

* * * *

[1] TMF was formed in 1991, Marketing was formed in 1998. Both entities were Subchapter S corporations during relevant tax periods.

[2] The Diener 2000 tax return includes 50% of the liquidating trust's activity for the year. This includes Robert Diener's direct portion, the portions allocable to grantor trusts established for his three children and the portion allocable to his irrevocable trust.

184

| Form 886-A (REV JANUARY 1994) | EXPLANATIONS OF ITEMS | SCHEDULE NO. OR EXHIBIT Form 4549 |
|---|---|---|

| NAME OF TAXPAYER | TAX IDENTIFICATION NUMBER | YEAR/PERIOD ENDED |
|---|---|---|
| Robert B. and Michelle S. Diener | 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 | December 31, 2000 |

In February 2000, HRN sought to issue an IPO and, as a result, HRN and the Trust entered into an amended and restated asset purchase agreement pursuant to which HRN's contingent cash payment obligations for the 12 month periods ending March 31, 2001 and 2002 were extinguished in exchange for HRN's agreement to issue to the Trust shares of HRN's stock. A total of 9,999,900 shares of class A common stock of HRN were acquired by the Trust on February 24, 2000, immediately prior to HRN's IPO on February 25, 2000. Although issued to and held in trust, Messrs. Diener and Litman (or related entities) each owned 4,999,950 shares of the class A common stock subsequent to the HRN's offering.

All 9,999,900 shares issued to the Trust on 2/24/2000 were subject to contractual restrictions on resale or transfer. The restricted shares were not registered under the Securities Act of 1933, as amended, and the Trust did not have the right to cause such shares to be registered until the fourth anniversary of the Issuer's initial public offering.[3] Generally, no sales or transfers were permitted during the first year following the Issuer's initial public offering. After the first anniversary of the initial public offering, certain transfers were permitted to the Trust beneficiaries and members of their families, and sales or other transfers could occur for up to 1,714,966 of the total number of shares held by the Trust. After the second anniversary of the initial public offering, sales or other transfers could occur for up to an additional 489,990 shares. After the third anniversary of the initial public offering, sales or other transfers could occur for up to an additional 489,990 shares. After the fourth anniversary of the initial public offering, all restrictions expired and the Trust had a one time right to demand registration of all of the class A shares initially issued to the Trust.

On February 25, 2000, HRN completed the IPO in which it sold 6,210,000 shares of class A common stock for $16 per share, raising $90 million in proceeds net of offering expenses. HRN's public reports to the SEC indicate through 12/31/2000 the total amount paid to acquire the assets of TMF and Marketing totaled $406 million. This total is based on cash payments of $246 million and stock valued at $159,998,400 (9,999,900 shares @ $16 per share).

Although the stock was issued to the public for $16 per share, the stock issued to Trust immediately prior to the IPO differed in that it was restricted. As a result, Mr. Diener sought and obtained two separate appraisals to determine the fair market value of the restricted stock at the date of receipt. The two valuations differed; both valuations determined a FMV substantially less than $16/share.

Mr. Diener sought to come to an agreement with HRN as to the value of the restricted stock but HRN would not agree to less than $16/share. Mr. Diener reported the gain from the receipt of HRN stock using the higher of his two valuations which determined a total FMV of $45,437,824 for the 9,999,900 shares or an average value of $4.5438/share[4]. Mr. Diener reported his 50% portion of the proceeds, or $22,718,912.

* * * *

[3] These restrictions are commonly known as "Rule 144" restrictions.

[4] Figures is rounded from $4.54382783827/share.

185

| Form 886-A (REV JANUARY 1994) | EXPLANATIONS OF ITEMS | | SCHEDULE NO. OR EXHIBIT Form 4549 |
|---|---|---|---|
| NAME OF TAXPAYER | | TAX IDENTIFICATION NUMBER | YEAR/PERIOD ENDED |
| Robert B. and Michelle S. Diener | | 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 | December 31, 2000 |

The position taken by the purchasing corporation, HRN, is that the fair market value of the 9,999,900 share of restricted stock at the date of issuance was $159,998,400 or $16 per share based on the IPO value. It is the position of Mr. Diener that the value of the stock at the time of issuance was an average of $4.5438 per share based on the valuation report obtained by him. Since 4,999,950 of the shares were issued (in trust) to Mr. Diener, the difference between the two valuations results in a whip-saw issue. Unless resolved, the inconsistency in fair market values results in an understatement of taxable income of $57,280,288 [($16.00 - $4.54382783827) X 4,999,950] between the tax returns of Robert and Michelle Diener and HRN.

During the course of this examination efforts were made once again by the taxpayer to reach an agreement with HRN as to the value of the restricted stock. HRN was not willing to negotiate. As a result of HRN's unwillingness to discuss the FMV issue, the taxpayer refused to extend the statute of limitations. Since the statute of limitations expires for the 2000 tax return on October 15, 2004, a statutory notice of deficiency is necessary to protect the government's interest until the whipsaw issue can be resolved.

## Law

I.R.C. § 1001 provides that the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain.

I.R.C. § 1001(b) provides that the amount realized from the sale or other disposition of property is the sum of any money received plus the fair market value of property received.

Rev. Rul. 77-287, 1977-2 C.B. 319 sets forth guidelines for valuing securities that cannot be immediately resold because they are restricted from resale pursuant to Federal securities law.

## Government's Position:

This issue results from the inability of the parties to the transaction to reach an agreement as to the proper FMV of restricted stock issued in connection with a taxable asset acquisition.

It is the Service's position that an issue of this nature should not be required to be addressed during the course of an examination because the transaction was completed between two independent taxpayers in an arms-length transaction. An agreement as to the FMV of the stock should have established between the parties prior to tax returns being filed.

Mr. Diener sought an independent, outside appraisal to determine the FMV of the restricted stock while HRN refused to accept the values determined by Mr. Diener's valuations yet sought no valuation to support their claimed FMV. The valuation issue was never resolved between the parties and the inconsistent, whipsaw, positions ultimately result in a net understatement of income tax.

186

| Form 886-A (REV JANUARY 1994) | EXPLANATIONS OF ITEMS | | SCHEDULE NO. OR EXHIBIT Form 4549 |
|---|---|---|---|
| NAME OF TAXPAYER Robert B. and Michelle S. Diener | | TAX IDENTIFICATION NUMBER 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 | YEAR/PERIOD ENDED December 31, 2000 |

IRC Section 1001(a) provides that the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis of the property.

I.R.C. § 1001(b) provides that the amount realized from the sale or other disposition of property is the sum of any money received plus the fair market value of property received. The amount realized by Mr. Diener from the sale includes cash and restricted stock from HRN however the amount realized cannot be definitively computed without the parties to the transaction coming to an agreement on the FMV of the restricted stock.

It is well settled that restrictions on the public sale of stock reduce the stock's fair market value; Estate of Piper v. Commissioner, 72 T.C. 1062, 1087, 1979 WL 3788 (1979); Bolles v. Commissioner, 69 T.C. 342 (1977); Hirsch v. Commissioner, 51 T.C. 121 (1968); Husted v. Commissioner, 47 T.C. 664 (1967). Revenue Ruling 77-287, 1977-2 C.B. 319 was issued to provide guidance to taxpayers, Internal Revenue Service personnel, and others concerned with the valuation, for Federal tax purposes, of securities that cannot be immediately resold because they are restricted from resale pursuant to Federal securities laws.

Since the HRN stock was unregistered and subject to resale restrictions of SEC Rule 144, this restriction limited their sale in the public marketplace and would generally justify a discount. However, since the statute of limitation is imminent and the taxpayer has decline to extent the statute, time does not permit a valuation to be prepared by the Service or for the parties to further attempt to come to an agreement on the FMV of the restricted stock. As a result, the portion of the gain from the receipt of HRN restricted stock is computed based on the FMV asserted by HRN, or $16 per share.

## Conclusion:

Taxable income is increased by $57,280,288 for the gain determined per exam on the taxpayer's receipt of HRN restricted stock. In order to protect the government's interest from the inconsistent, whipsaw positions reported by the taxpayer and HRN, the adjustment is based on the receipt of 4,999,950 shares at $16/share, which is the higher value asserted by the parties to the transaction.

187