# EXHIBIT F

**TO**

**PLAINTIFFS' PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **ROBERT D. DIENER and MICHELLE S. DIENER** | ) | |
| | ) | |
| **Plaintiffs-Counterdefendants,** | ) | |
| | ) | |
| **V.** | ) | **No. 05-971T** |
| | ) | **(Judge Christine O.C. Miller)** |
| **THE UNITED STATES** | ) | |
| | ) | |
| **Defendant-Counterplaintiff.** | ) | |

**<u>Affidavit of Michelle S. Diener</u>**

STATE OF FLORIDA §
§
COUNTY OF DADE §

Before me, the undersigned notary public, personally appeared Michelle S. Diener, who, being duly sworn upon her oath, stated as follows:

1. My name is Michelle S. Diener. I am over the age of 18 and I am fully competent to make this affidavit. The facts contained in this affidavit are true and correct and based upon my personal knowledge.

2. In May of 1999, all of the assets of TMF, Inc, a Subchapter S corporation in which my husband, Robert Diener ("Bob"), and I (as well as a trust of which we are treated as grantors) owned a fifty percent interest, were sold to USA Networks ("the 1999 Contract"). David and Malia Litman (and trusts of which they are treated as grantors) owned the remaining fifty percent interest.

3. During 1999, TMF, Inc. was liquidated and its assets (including, without limitation, the sales proceeds and other rights under the 1999 Contract) and its liabilities were transferred to a liquidating trust ("TMF Liquidating Trust"). The beneficiaries of the TMF Liquidating Trust were the same as the stockholders of TMF, Inc. and held beneficial ownership interests in the TMF Liquidating Trust in the same percentages as their stock ownership in TMF, Inc.

4. HRN was anticipating making an initial public offering of a portion of its common stock during February of 2000. Effective February 2, 2000, the 1999 Contract was amended ("the 2000 Amendment"). As a part of the 2000 Amendment ("the Transaction"), TMF Liquidating Trust exchanged certain earn-out rights under the 1999 Contract for the right to receive restricted equity interests in the common stock of HRN.

5. The shares of stock to be received by TMF Liquidating Trust from the Transaction were subject to onerous sale restrictions (the "Restricted Shares"). These sale restrictions included, among other things, (1) contractual holding periods (the majority of the Restricted Shares were subject to a four year restriction on sale), (2) SEC Rule 144 volume restrictions on the number of Restricted Shares that could be sold after holding periods expired, (3) the requirement that approval of HRN's parent company be obtained before any Restricted Shares could be sold, (4) the practical market restriction on sale due to the fact that TMF Liquidating Trust was owned by the CEO and President of HRN and would be subject to additional securities law restrictions, and (5) the public float was initially only half the size of the Restricted Shares issued to TMF Liquidating Trust, so practically the Restricted Shares could not be sold without drastically lowering the market price. The contractual transfer restrictions are described in detail in the 2000 Amendment.

6. The 2000 Amendment resulted in the capital gains reflected on Line 12 of Schedule D of the U.S. Individual Income Tax Return, Form 1040, for calendar year 2000 filed by Bob and me ("our 2000 Form 1040").

7. In determining the fair market value of the Restricted Shares, we knew that the substantial sale restrictions caused the Restricted Shares to be worth less than the initial public offering price of the HRN stock, but we were not certain how much less. Because of this uncertainty, we sought professional appraisal help in determining the fair market value of the Restricted Shares. Bob and I, along with David and Malia Litman, sought the help of Business Valuation Services, Inc. ("BVS"), a very reputable independent appraisal firm, often relied upon by individuals, corporations and even the Internal Revenue Service with respect to complex valuation matters. To the best of my knowledge, neither Bob nor I are related to anyone employed by, or with an ownership interest in, BVS.

8. BVS prepared an independent appraisal report expressing its opinion of the appropriate discount for lack of marketability to be applied in determining the fair market value of the Restricted Shares received by TMF Liquidating Trust. Bob and I relied on the BVS appraisal report in good faith to report the fair market value of the Restricted Shares received by TMF Liquidating Trust as a result of the Transaction on our 2000 Form 1040. We subtracted the discounts for lack of marketability determined by BVS from the $16 per share initial public offering price of the HRN stock to determine the fair market value of the Restricted Shares.

9. Before reporting the value of the Restricted Shares consistently with the BVS appraisal analysis, Bob and I also reviewed a second independent, professional appraisal analysis of the fair market value of the Restricted Shares. The second appraiser's opinion resulted in a lower fair market value for the Restricted Shares than the BVS analysis. Although we felt this analysis was also reasonable due to the severe transfer restrictions imposed on the Restricted Shares, we took a more conservative

approach and reported the fair market value of the Restricted Shares at the higher value, using the values determined in the BVS appraisal on our 2000 Form 1040.

Michelle S. Diener

SWORN TO AND SUBSCRIBED BEFORE ME this 18 day of November, 2005.

Jacqueline de Grave
Notary Public, State of Florida

Jacqueline S. de Grave
Commission #DD248506
Expires: Sep 09, 2007
Bonded Thru
Atlantic Bonding Co., Inc